J. Thomas Beckett, USB #5587
Brian M. Rothschild, USB #15316
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
TBeckett@parsonsbehle.com
BRothschild@parsonsbehle.com
ecf@parsonsbehle.com

*Proposed Attorneys for Marion Energy Inc*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>MARION ENERGY INC,<br><br>Debtor, | Case No. 14-31632<br><br>Chapter 11<br><br>The Honorable Joel T. Marker |

**DECLARATION OF JEFFREY CLARKE IN SUPPORT OF FIRST-DAY MOTIONS**

Jeffrey Clarke, under penalty of perjury, herby states:

### I.    QUALIFICATIONS

1.    I am a director of Marion Energy Inc ("Marion" or the "Debtor"), which has its corporate headquarters in Allen, Texas.  I have been employed in this capacity since Marion's founding in September 2004.   In this capacity, I am familiar with the Debtor's day-to-day operations, books, records businesses, and financial affairs.

2.    I have an undergraduate degree from the University of Wales and a graduate degree from the University of East Anglia, both in physics.  I have been in the oil and gas industry for 43 years. I started out working in the Middle East and in North Africa. Since 1977,

4817-9650-2304.2

been working in North America. I initially went to Canada in 1977, and have been working in the United States since 1983. I have extensive international experience and a great deal of domestic experience in the U.S. I've run public companies listed on the NASDAQ Exchange and private companies, and I've built up and sold several such companies.

3. Prior to forming Marion, I was the CEO of Ascent Energy, an oil and gas company based in McKinney, Texas. While there, I oversaw the takeover of Forman Petroleum, a privately-held company with reserves of over 50 billion cubic feet of gas. I oversaw an active and successful exploration and exploitation program in the company's active areas with capital expenditures of over $40 million per year.

4. Most notably, I was CEO of Coho Energy, Inc. ("Coho") a Dallas-based publicly traded oil and gas company. I assisted in taking Coho public in 1990 and was responsible for the $20 million takeover of MIDLA Energy, a private gas producer and a $200 million acquisition of assets from Amoco in Oklahoma. During my tenure, Coho went from zero production per day to 20,000 barrels of oil equivalent per day over a nine-year period with reserves growth to 110 million barrels of oil equivalent proved onshore reserves in the United States. Prior to my term as CEO of the US based company, I was VP of Exploration for Coho Resources Ltd. Canada.

5. On October 31, 2014 (the "Petition Date"), Marion filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court"). The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2

4817-9650-2304.2

6. I submit this declaration (this "First-Day Declaration") to provide an overview of the Debtor and this chapter 11 case and to support the Debtor's chapter 11 petition and "first-day" motions (the "First Day Motions").[1] Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management and advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial

---

[1] The First-Day Motions filed contemporaneously herewith are as follows:

 a) Application of Debtor Marion Energy Inc for Interim and Final Orders Authorizing the Employment and Retention of Parsons Behle & Latimer As Attorneys for the Debtor *Nunc Pro Tunc* As of the Petition Date and Disclosure Pursuant to Bankruptcy Rule 2016(b);

 b) Debtor Marion Energy Inc's Motion for Interim and Final Orders (1) Authorizing Payment of Prepetition Claims of Utility Providers and (2) Determining Adequate Assurance of Payment for Future Utility Services;

 c) Debtor's Motion for an Order, Authorizing Payment of Certain Prepetition (1) Wages, Salaries and Other Compensation, (2) Employee Medical and Similar Benefits, (3) Withholdings from Employee Paychecks and Related Deductions and Payments, and (4) Reimbursable Employee Expenses;

 d) Debtor's Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 363, 364 And 507 (1) Authorizing Debtor In Possession To Obtain Post-Petition Financing; (2) Granting Liens And Providing Superpriority Administrative Expense Status; (3) Granting Adequate Protection; and (4) Modifying The Automatic Stay; and

 e) Debtor's Ex Parte Motion Requesting (1) An Expedited Hearing on the First Day Motions, (2) Shortening of Time for Notice and Objection to the Interim Relief Requested in the Following First-Day Motions or Finding that No Further Notice Is Necessary, and (3) Scheduling a Final Hearing on the First-Day Motions Within 30 Days

condition. I am authorized to submit this First-Day Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## II.     PRELIMINARY STATEMENT

7. Marion is a Texas corporation engaged in exploration and production of natural gas in the State of Utah. Marion's core operation is a producing gas field located in Carbon and Emery Counties, Utah (the "Clear Creek Field"). The Company also holds smaller, currently unproductive acreage positions in the Helper and Roan Cliffs area near Helper, Utah (the "Helper Field").

8. As set forth in more detail below, the value of Marion's gas production assets, and the Clear Creek Field in particular, likely exceeds $100 million based solely on proven reserves, and is very likely much higher. While Marion's operations are nearing the point where significant production can begin, they are currently resulting in only small, sporadic production of gas for sale into the Questar pipeline, and thus Marion is currently generating insufficient revenue to fund its day-to-day operations.

9. To pay pre-existing debt and fund its operations in the Clear Creek Field, Marion entered into a secured credit agreement with TCS II Funding Solutions, LLC ("TCS") (the lender is commonly referred to by the parties as "Castlelake") dated as of June 24, 2013 (the "Credit Agreement"), pursuant to which Marion borrowed $25 million on a secured basis. In addition, Marion has borrowed approximately $134,024,408.21 from its parent company, Marion Energy Limited, and has borrowed from other sources to funds its operations.

10. Due to heavy snowfall and severe cold in the winter of 2013/2014, unexpected equipment problems, third-party operational delays, and other operational issues, Marion was

unable to meet its production-related covenants and is currently in default under the terms of the Credit Agreement.  Beginning in June 2014, Marion began negotiating a forbearance period with Castlelake to give Marion time to obtain new financing from which it could pay Castlelake.  As a condition of entering into the latest forbearance agreement dated September 8, 2014, Castlelake required Marion to sign a verified statement for judgment by confession, a stipulated judgment, a joint motion stipulating to the appointment of a receiver, an authorization for the receiver to conduct a 60-day sale of Marion's assets, and an assignment of Marion's right of redemption, all of which could be filed by Castlelake on November 3, 2014 (collectively, the "Receivership Documents").

11.     During negotiations, Castlelake demanded payment of $17.6 million for early repayment under a so-called "make-whole" provision of the Credit Agreement.  Marion disputes the amount and its liability under the make-whole provision.  The parties agreed to submit the make-whole issue to arbitration and agreed on a briefing schedule during November and December 2014.  The forbearance period agreed to by Castlelake, however, only runs through October 31, 2014. .  Castle Lake has refused to grant Marion further forbearance and, on November 3, will have the right to seek appointment of a receiver under the Receivership Documents, forcing Marion to file this chapter 11 case to prevent appointment of a receiver and an uneconomic liquidation of its assets.

12.     Concurrent with the negotiations with Castlelake, Marion began searching for alternative financing through its financial consultants, 333 Capital Pty Ltd, and, at a later stage, Houston Merchant Energy Partners.  As a result, Marion signed an exclusive engagement letter with a proposed lender, Anchorage Capital Group, LLC and entered into a financial and

technical due diligence process with this proposed lender. The proposed replacement credit facility was subject to a satisfactory technical due diligence report by Ryder Scott, one of the largest gas and petroleum consultancies in the world. The initial report was due in mid-September. For reasons that are not apparent to Marion or to the proposed financier, Ryder Scott failed to produce its final report in a timely fashion. Ryder Scott has thus far only produced a draft email report to the proposed lender, but the draft report is inadequate and could not be relied upon by the lender. The proposed lender is at this point in time unable to perform the necessary technical due diligence in time to prevent appointment of the receiver.

13. Castlelake refused to provide further forbearance, instead, insisting on exercising its right to appoint a receiver and fire sale Marion's assets. Marion filed this chapter 11 case to prevent Castlelake from appointing a receiver and forcing an uneconomic liquidation of Marion's assets using a 60-day sale process. Marion requires sufficient "breathing space" to complete a refinancing with a new lender, to preserve its going-concern value. After Marion obtains new financing, it will confirm a chapter 11 plan that will enable it to pay its secured prepetition lender, Castlelake, in full, and to continue the process of bringing its gas production on line until it achieves profitability.

### III.   GENERAL BACKGROUND

A.   The Debtor's Business and Corporate Structure

14. Marion is a Texas corporation engaged in exploration, development and production of natural gas in the State of Utah. Marion is 100% owned by Marion Energy Limited ("MEL"). MEL is a publicly traded independent oil and gas production company listed on the Australian Securities Exchange (ASX) under ASX code MAE. Marion was founded in

September 2004 and shortly thereafter backed into Carpenter Pacific Resources, an ASX listed shell company (later renamed Marion Energy Limited), while simultaneously completing an A$22 million private placement for initial capitalization. In 2005, the Company began acquiring interests in Utah.

B.      The Debtor's Assets and Operations

15.     As noted above, Marion's primary assets are the producing Clear Creek Field gas field located in Utah's Uinta Basin and the currently unproductive Helper Field near Helper, Utah.

16.     Clear Creek Field comprises approximately 17,775 net acres of leases within a federal unit in Carbon and Emery counties.  Clear Creek field is notable in that it is only 12 miles from and geologically similar to the Drunkards Wash field, which is a notable field for having produced approximately 1 trillion cubic feet of natural gas.

17.     Originally developed in the 1950s as the primary gas source for Salt Lake City, Utah, Clear Creek Field has produced a total of 137 billion cubic feet (Bcf) of gas from 18 wells from the Ferron sands drilled up on approximately 1,000 acre spacing. Due to the rugged nature of the Wasatch Plateau and the fact that the unit was developed prior to the onset of directional drilling, wells were historically drilled from locations dictated by topography and not necessarily dictated by structural position.  Clear Creek Field produced without interruption until the early 1960s when intra-basin gas production started competing for line space.  Increased line pressures, a lack of suitable drilling locations, and the fact that original completions were open-hole and involved the use of nitroglycerin for stimulation all led to a sharp decline in production through the early 1970s.

18. After an initial farm-in agreement signed in 2005, Marion purchased Clear Creek Field in 2006, and began work to bring the field back into production, including the drilling and/or recompleting ten new wells at the site. The pressure measured in the producing reservoir in the newly drilled well bores is very close to the initial reservoir pressure measures in the wells drilled in the 1950s and 1960s, indicating that the reservoir was not drained by the original wells and that significant recoverable reserves are still in place.

19. Clear Creek Field's proven reserves were confirmed by an independent engineering report commissioned from MHA Petroleum Consultants of Denver, Colorado (the "MHA Report" a true and correct copy of which is attached as **Exhibit A** hereto), which report has been updated over time. Oil and gas exploration and production companies such as Marion regularly order or produce and update such reports and keep them as business records to provide information to their investors and management regarding the size and value of their reserves. In fact, MEL produced the material findings of the MHA Report as an exhibit to a public filing regarding the value of Marion's assets (the "Reserves Public Report"). Attached as **Exhibit B** hereto is a true and correct copy of the Reserves Public Report. The Reserves Public Report declared that the proven reserves at Clear Creek Field were 126 Bcf, which would result in a net cash flow of US$353,055,000, which, discounted to NPV at 10% results in a present value of US$156,264,000. Marion intends to submit the most recent MHA Report with a declaration of Lesley O'Connor of MHA Petroleum Consultants of Denver, and the Reserves Public Report, and intends to offer them into evidence to establish the amount and value of the proven gas reserves at Clear Creek Field under Rules 807 and 803 of the Fed. R. Evid. In addition, I am familiar with the content of the MHA Report and the Reserves Public Report, the facts and

8

evidence supporting them, the methodology used to create them, and I worked closely with MHA Petroleum Consultants to provide information and complete the MHA Report. My knowledge of these matters derives from my expertise and from closely overseeing Marion's field operations in the Clear Creek Field on a day-to-day basis.

20. Based on the MHA Report, the information provided by Marion, its management and financial advisors, and my own expertise, the value of Marion as a going-concern is at least $100 million based on the 42.9 Bcf of proved reserves allocated to the wells that are tied into the producing infrastructure and the intrastate gas sales line owned by Questar, and the 83.1 Bcf of proven undeveloped reserves outlined in the MHA report.

21. Based on reservoir characteristics and analogies with Drunkards Wash field, it would take at least one hundred wells to fully drain the field. The wells drilled by Marion are within the geographic confines of the structural trap defined by the original eighteen wells drilled during the 1950s and 1960s. Pressure tests on the original wells have shown that these wells have re-pressured to some extent and a number of these original wells are potentially capable of producing significant amounts of natural gas.

C. Marion's Development of Gas Production Capacity

22. Marion has invested in a substantial infrastructure for gathering and compressing gas in Clear Creek Field, and for the pumping, collection and onsite disposal of produced water. The original gathering lines in the field were abandoned and rendered inoperable when the production was shut down in the early 1970s, and compression equipment was removed from the site. The gas wells in this formation produce a significant amount of salt water, which must be

pumped and disposed of to obtain continuous gas production, and there was no system in place to pump, gather and dispose of this water in compliance with modern regulatory requirements.

23. Due to liquidity constraints prior to the Castlelake financing, Marion was unable to complete all of the significant infrastructure improvements needed at Clear Creek Field that were required to produce the field. In late December 2010 Marion was able to permit an onsite salt water disposal well and convert an existing well to such, which was essential for the economic production of gas at Clear Creek Field. Shortly after Marion completed the associated water collection and disposal system, however, it was damaged by a land slide, and Marion had insufficient funds to repair and re-commission the system. Marion's field operations were put on hold while it sought additional funding.

24. In June 2013 following the Castlelake financing, Marion was able to commence remedial operations necessary to bring the field back into production. While the field was shut in, much of the infrastructure and wellbores had suffered from neglect. Commencing in July of 2013, under the close supervision of the Utah Division of Oil, Gas and Mining, Marion rehabilitated several of the wells and the field infrastructure, including employing new high volume pumping units on several of the wells to bring water levels down.

25. Clear Creek Field requires compression to produce into the higher pressure Questar interstate pipeline, and it was Marion's intention to use an existing Questar-owned compressor to begin production in the field. After persevering for several months with this compressor it was determined that it was unusable and therefore Marion arranged for a rental compressor to be installed. The installation and commissioning of this compressor took longer

4817-9650-2304.2

than estimated by the compressor owner, and it only became operational in December of 2013. In the meantime, Marion was continuing with its field rehabilitation operations.

26. During the winter of 2013/2014, the Wasatch Plateau experienced unusually severe snowstorms and high wind events, and several extreme cold snaps. As a result, Marion's access to Clear Creek Field, portions of which are located on mountain ridges above 10,000 feet, was severely limited. It was necessary to pay for snow removal on the roads to the field locations on an almost daily basis. The severe cold froze the water disposal system, interfered with operation of the diesel generators needed to pump down water levels, and caused other unusual equipment problems. The weather impeded operations and added significantly to the expense of rehabilitating Clear Creek Field. It was not until the snow was mostly gone in May that Marion had any semblance of normal operations. By this time Marion was in default of a number of production-related covenants in the TPS Credit Agreement.

D.   The Debtor's Capital Structure

27. Marion was founded in September 2004 and shortly thereafter backed into Carpenter Pacific Resources, an ASX listed shell company which was later renamed Marion Energy Ltd (MEL), while simultaneously completing an A$22 million private placement for initial capitalization. In 2005, Marion began acquiring interests in Utah.

28. As described above, Marion's operations are not yet resulting in the regular production of gas into the Questar pipeline, and thus Marion is not currently generating sufficient revenue to fund its day-to-day operations. Marion initially funded its operations by borrowing funds from its corporate parent, MEL. As of the Petition Date, Marion owes MEL $134,024,408.21 as an intercompany payable.

29. In addition, MEL borrowed funds denominated in Australian dollars (A$) to pay for Marion's operations from KM Custodians Pty Ltd., and Marion guaranteed this loan. The outstanding balance on the KM Custodians Pty Ltd. loan was A$2,548,953 as of the Petition Date.

30. In June 2013, Marion borrowed $25 million under the Credit Agreement with Castlelake. As of the Petition Date, the principal and interest owing on under the Credit Agreement total $34,441,393.64. In addition, Castlelake asserts that it is owed approximately $17.6 million as a "make-whole" premium in the event of a prepayment under the Credit Agreement. Marion disputes both the amount asserted and that a repayment under these circumstances would require payment of the make-whole premium.

E.      The Debtor's Efforts to Refinance or Sell its Assets

31. Marion began searching for alternative financing through its financial consultants, 333 Capital Pty Ltd, and, at a later stage, Houston Merchant Energy Partners. As a result, Marion signed an exclusive engagement letter with a proposed lender, Anchorage Capital Group, LLC and entered into a financial and technical due diligence process with this proposed lender. The proposed replacement credit facility was subject to a satisfactory technical due diligence report by Ryder Scott, one of the largest gas and petroleum consultancies in the world. The initial report was due in mid-September. For reasons that are not apparent to Marion or to the proposed financier, Ryder Scott failed to produce its final report in a timely fashion. Ryder Scott has thus far only produced a draft email report to the proposed lender, but the draft report is inadequate and could not be relied upon by the lender. The proposed lender is at this point in

4817-9650-2304.2

time unable to perform the necessary technical due diligence in time to prevent appointment of the receiver.

32. In addition to refinancing, Marion has considered selling its assets through a sale process. Marion's financial consultants advised us that, given the current state of field operations, more time is required for the wells to reach their targeted production levels in order to achieve an optimal sales price for the Clear Creek Field. Under the receiver model proposed by Castlelake, Marion would be required to complete a sale in 60 days pursuant to the Receivership Documents. The outcome of such a sale would be uncertain to yield the highest price for the assets. A short-term forced sale process would likely yield a significantly lower value than Marion's value as a going concern. In addition, Marion estimates that the funding required to market and sell the assets in the time frame proposed by Castlelake would be approximately $1 million, and the Company is currently unable to raise sufficient funds to complete such a sale process given the effectively subordinated nature of such funding. The proposed receiver would most likely have to look for funding to Castlelake who has stated repeatedly that the cost of such funding would be the full equity in the Clear Creek Field.

F. The Debtor's Decision to File this Chapter 11 Case

33. The forbearance agreement between Marion and Castlelake runs through October 31, 2014. Castlelake has refused to grant Marion further forbearance and, on November 3, will have the right to seek appointment of a receiver under the Receivership Documents, forcing Marion to file this chapter 11 case to prevent appointment of a receiver and an uneconomic liquidation of its assets.

34. Concurrent with the negotiations with Castlelake, Marion began searching for alternative financing. Marion and the potential new lenders were unable to complete diligence in sufficient time to allow a new loan to fund, and Castlelake refused to provide further forbearance, instead, insisting on its right to appoint a receiver and fire sale Marion's assets.

35. Marion filed this chapter 11 case to prevent Castlelake from appointing a receiver and forcing an uneconomic liquidation of Marion's assets using a 60-day sale process. Marion requires sufficient "breathing space" to complete a refinancing with a new lender, to preserve its going-concern value. After Marion obtains new financing and confirms a chapter 11 plan that enables it to pay its creditors in full, it will continue the process of bringing its gas production on line until it achieves profitability.

## IV. INFORMATION SUPPORTING THE FIRST-DAY MOTIONS

A. <u>The Debtor's Employees and Contractors</u>

36. As of the Petition Date, the Debtor employed ten employees worldwide. In the ordinary course of its business, Marion pays the wages and salaries of all of the Debtor's employees (the "<u>Payroll Obligations</u>"). Employees are paid twice per month on the 15th and the last day of the month, except when a payday falls on a non-business day, in which case the payday is moved forward to the previous business day. The aggregate gross monthly payroll for all of Debtor's employees is approximately $153,749.58. The Debtor paid all outstanding Payroll Obligations to its employees in the ordinary course of business the day before the Petition Date. Therefore, the Debtor believes that it has no unpaid prepetition Payroll Obligations. It is unlikely that any prepetition Payroll Obligations will exceed $11,725 per employee.

37. The Debtor offers its employees certain general welfare benefits, including the certain benefits (the "Prepetition Benefits"). The Prepetition Benefits include, without limitation, benefits under medical insurance plans, and an optional life insurance plan. The Prepetition Benefits are an integral and important part of each employee's total compensation package. Interruption of such benefits would seriously disrupt the morale of the employees and would undermine the Debtor's operations.

38. The Debtor believes that continued provision of the Prepetition Benefits is essential to maintaining the valued service and morale of its employees. On average, the Debtor pays approximately $21,968 per month in medical benefits. These benefits are applied as follows, approximately $18,961.25 monthly to United Health Care and approximately $3,006.78 to Guardian. These amounts are customarily paid concurrently with the Debtor's payroll so the Debtor believes that there are no amounts due on account of the Prepetition Benefits.

39. Certain of the Prepetition Benefits require employee contributions, which are typically funded through payroll deductions. In such cases, the Debtor deducts an employee's contribution from the employee's payroll check and subsequently pays those funds, along with any required employer contributions to the appropriate third parties. The Debtor also routinely and ordinarily makes deductions from the employees' payroll relating to federal, state, and local tax withholdings, employee savings programs, and garnishments. The Debtor requests authority to pay over to the appropriate parties all such Third-Party Funds in accordance with applicable law and existing company policies and practices. On average, the Debtor pays approximately $8,779.88 per month in employer payroll taxes.

4817-9650-2304.2

40. The Debtor customarily reimburses employees for business expenses incurred in the ordinary course of performing their duties on behalf of the Debtor (the "Reimbursement Obligations"). The Reimbursement Obligations include, among other amounts, expenses incurred in connection with travel, business-related entertainment, long-distance telephone charges, and various ordinary course expenses that the Debtor's employees incur in performing their jobs. To obtain reimbursement, employees are required to submit an expense report within thirty (30) business days after the completion of a reimbursable expense. Because there may be employees who have incurred business expenses prior to the Petition Date but have not yet submitted an expense report, it is difficult for the Debtor to determine the exact amount outstanding as of the Petition Date. Nevertheless, the Debtor believes such amounts to be nominal if there are any at all.

41. In addition to its regular employees, Marion employs outside professionals such as engineers, bookkeepers, financial consultants, petroleum-industry consultants, environmental consultants, and other independent contractors. Continued employment of these outside professionals is vital to the ongoing operations of Clear Creek Field.

B. Utilities

42. In the ordinary course of its operations, the Debtor incurs expenses for electricity, telecommunications, and other similar utility services provided by approximately three utility providers (as such term is used in Bankruptcy Code section 366, collectively, the "Utility Providers"). The Debtor's Utility Providers are as follows:

| Utility Provider | Utility |
|---|---|
| Rocky Mountain Power | Electricity |
| Time Warner Business | Telecomm/Internet |
| CentraCom | Telecomm |

16

4817-9650-2304.2

On average, the Debtor spends approximately $1,390 each month on utility costs. As of the Petition Date, the Debtor estimates that only a nominal amount, if any, utility costs are outstanding.

43. Uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtor's field and office operations, seriously jeopardizing the Debtor's reorganization efforts and, ultimately, recoveries to its stakeholders. It, therefore, is critical that utility services continue uninterrupted during these chapter 11 cases.

C.  DIP Financing

44. To fund its operations and the costs of this chapter 11 case, the Debtor has reached an agreement with KM Custodians Pty. Ltd. to provide debtor-in possession financing on a superpriority secured basis (the "DIP Loan"). The terms of the DIP Loan are set forth in the Debtor's Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 363, 364 And 507 (1) Authorizing Debtor In Possession To Obtain Post-Petition Financing; (2) Granting Liens And Providing Superpriority Administrative Expense Status; (3) Granting Adequate Protection; and (4) Modifying The Automatic Stay (the "DIP Motion").

45. The Debtor, with the assistance of its financial consultants, was unable to find DIP financing on any reasonable basis other than that of a first priority secured basis as set forth more fully in the DIP Motion. The DIP Loan will provide necessary liquidity to fund the Debtor's operations and the chapter 11 case while it negotiates a refinancing of its assets in order to pay Castlelake and its other creditors.

*Pursuant to 28 U.S.C. § 1746, 1 declare under penalty of perjury that the foregoing statements are true correct.*

Dated: October 31, 2014

    McKinney, Texas

_____
Jeffrey Clarke
Director
Marion Energy Inc