J. Thomas Beckett, USB #5587
Brian M. Rothschild, USB #15316
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
TBeckett@parsonsbehle.com
BRothschild@parsonsbehle.com
ecf@parsonsbehle.com

*Proposed Attorneys for Marion Energy Inc*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| In re: | Case No. 13-31632 |
|---|---|
| MARION ENERGY INC, | Chapter 11 |
| Debtor, | Judge Joel T. Marker |

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 363, 364 AND 507 (1) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN POST-PETITION FINANCING; (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (3) GRANTING ADEQUATE PROTECTION; AND (4) MODIFYING THE AUTOMATIC STAY

Marion Energy Inc, debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case, by and through its proposed counsel, submits this motion (the "Motion") for entry of interim and final orders pursuant to 11 U.S.C. §§ 105, 361, 363, 364 and 507, (1) authorizing post-petition financing, (2) granting priming liens and providing superpriority administrative expense status, (3) granting adequate protection, and (4) modifying

the automatic stay in connection with debtor-in-possession financing to the Debtor by KM

Custodians Pty Ltd., (the "<u>DIP Lender</u>" or "<u>KM</u>"), and represents as follows:[1]

## I.    JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are 11 U.S.C. §§ 105, 361, 362, 363, and

364, and Federal Rules of Bankruptcy Procedure 2002, 4001, 6004, 9014, and 9019, and the

Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Utah, Central

Division (the "<u>Court</u>").

## II.    RELIEF REQUESTED

4.      The Debtor requests an order approving the use of property of the estate other

than in the ordinary course of business and approving the Debtor's incurring of debt.

Specifically, the Debtor requests an order (1) authorizing the Debtor to enter into the DIP Loan

(as defined herein) with the DIP Lender substantially in accordance with the terms of the draft

DIP Loan and Security Agreement ("<u>DIP Loan Agreement</u>"), a copy of which is attached hereto

as **<u>Exhibit A</u>**, the proposed interim order (the "<u>Interim Order</u>") substantially in the form attached

hereto as **<u>Exhibit B</u>**, and the Final Order (as defined herein) substantially in the form attached

hereto as **<u>Exhibit C</u>**, and to take all actions necessary to consummate the DIP Loan (as defined

herein), (2) authorizing the Debtor to grant priming liens on all of its current and future property

as collateral and super priority claims in connection with the DIP Loan (as defined herein),

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the draft DIP Loan and Security Agreement.

4834-2854-6080.3

(3) granting adequate protection and (4) approving modification of the automatic stay to the extent necessary to implement and enforce the terms and provisions of the DIP Loan Agreement and DIP Loan (as defined herein).   The Debtor requests, by separate motion that the Court schedule a hearing within 30 days (the "Final Hearing") to consider entry of an order granting the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

### III.    BACKGROUND

5.      A detailed description of the Debtor and its business, and the facts and circumstances supporting this Application, are set forth in greater detail in the Declaration of Jeffrey Clarke, Director of Marion Energy Inc, in Support of First Day Motions (Doc. No. 3) (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

### A.    DIP FINANCING WITH DIP LENDER

7.      The Debtor is seeking authority to enter into a debtor-in-possession financing transaction with the DIP Lender in which the DIP Lender will lend up to $4,200,000 to the Debtor (the "DIP Loan"). The Debtor will grant the DIP Lender a perfected first-priority security interest in all of its assets to secure the DIP Loan, and will grant the DIP Lender a superpriority administrative claim.   The Debtor and the DIP Lender have agreed that the transactions contemplated by the DIP Loan shall be substantially in the form of the DIP Loan Agreement.

8.      The Debtor's need to use Cash Collateral and to obtain credit pursuant to the DIP Loan Agreement is immediate and critical.   The DIP is necessary to enable the Debtor to continue operations and to administer and preserve the value of its estate as a going concern.

3

The ability of the Debtor to finance its operations, maintain business relationships, to pay its employees, protect the value of its assets and otherwise finance its operations requires the availability of working capital from the DIP Loan, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors and equity holders, and the possibility for a successful administration of the case.  The Debtor does not have sufficient available sources of working capital and financing to operate in the ordinary course of business without the DIP Loan.

9.      The Debtor is seeking interim approval of the DIP Loan so that sufficient funds are available to provide the Debtor with the working capital it needs to operate.  As described in more detail herein, the Debtor will pledge all of its assets to secure the DIP Loan with priming first-priority perfected liens, and the DIP Loan will constitute allowed superpriority administrative expense claims having priority under Section 364(c)(i) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Debtor now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to: (i) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. §1930(a); (ii) the aggregate of the allowed reasonable fees and expenses incurred by the Debtor in connection with the administration of its chapter 11 case, including, without limitation, the fees, costs and expenses of the Debtor's professionals and advisors (subject to a carve-out as set forth in the DIP Loan Agreement) not to exceed the amounts set

4

forth in the Eight Month Estimated Expenses Budget (the "<u>Budget</u>"), a copy of which is attached hereto as **<u>Exhibit D.</u>**

10.     In support of the relief requested herein, the Debtor relies on this Motion, the First Day Declaration, and all supporting pleadings and evidence filed therewith.

### B.     SUMMARY OF PROVISIONS OF DIP LOAN FROM DIP LENDER

11.     The DIP Lender will not make the DIP Loan without a priming first-priority security interest in all of the Debtor's property and without the DIP Loan constituting allowed superpriority administrative expense claims.  As of the Petition Date, the Debtor has been unable to identify any lender or strategic investor other than the DIP Lender that will provide the Debtor the financing it desperately needs.

12.     In general terms, the proceeds of the DIP Loan are to be used as follows: (i) to pay fees, costs and expenses of the DIP Lender, including payment of Lender's reasonable attorney's fees and other out of pocket expenses; (ii) to pay post-petition operating expenses of the Debtor incurred in the ordinary course of business; (iii) to pay costs and expenses of administration of the chapter 11 case, including payment of approved professional fees, including attorney fees; and (iv) to pay other amounts as specified in the Budget and allowed by the Bankruptcy Court, in each case, in amounts and categories consistent with the Budget.

13.     Except as set forth in this Motion, the DIP Loan Agreement and the proposed Interim Order, the Debtor is unable to obtain the required funds through any other loan structure, including, without limitation: unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code; an administrative expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code; unsecured debt having the priority afforded by section 364(c)(1)

of the Bankruptcy Code; or secured debt as described in section 364(c)(2) or 364(c)(3) of the

Bankruptcy Code except as set forth in this Motion and the proposed Interim Order. The terms of

the DIP Loan are the best the Debtor has been able to identify, are fair and reasonable under the

circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its

fiduciary duty, and are supported by reasonably equivalent value and fair consideration. The DIP

Loan has been negotiated in good faith and at arm's length among the Debtor and the DIP

Lender. The Debtor investigated other options, but only the proposal from the DIP Lender was

sufficient to satisfy the Company's needs and allow the Debtor to orderly refinance its debts for

the benefit of its creditors.

      **C.     REQUIRED DISCLOSURES UNDER THE GUIDELINES FOR CASH COLLATERAL & FINANCING MOTIONS & STIPULATIONS, BANKRUPTCY RULE 4001(C) AND LOCAL BANKRUPTCY RULE 4001-2(a).**

      14.     The proposed DIP Loan Agreement contains the following terms and provisions

requiring disclosure under the Guidelines for Cash Collateral & Financing Motions &

Stipulations, Bankruptcy Rule 4001(c), and the Local Bankruptcy Rule 4001-2(a):[2]

| Disclosure Content and Related Bankruptcy Rule | Description |
| --- | --- |
| Commitment and Disbursements 4001(c)(1)(B) | **DIP Loan Agreement, Paragraph 2: Commitment:** Lender hereby agrees to make a loan to Borrower in the maximum principal amount of the Total Commitment. Subject to the terms and conditions contained herein, the Total Commitment shall be made available by Lender to Borrower, except for the Initial Advance Amount, in increments of $500,000 ("Advance Amount"). The sum of $700,000 (the "Initial Advance Amount") shall be advanced upon entry of the |

---

[2] In the event of any discrepancy between this summary and the terms of the DIP Loan Agreement or the Proposed Interim Order, the DIP Loan Agreement or the Proposed Interim Order control.

| | |
|---|---|
| | Interim DIP Order and each subsequent advance of an Advance Amount shall be made at the request of the Borrower on or after the entry of a Final DIP Order. terms and conditions of this Agreement and the Interim and Final DIP Orders (as such terms are defined below), shall be advanced in increments of $500,000, other than the Initial Advance Amount in the amount of $700,000. |
| Interest 4001(c)(1)(B)DIP | **DIP Loan Agreement, Paragraph 6: Interest Rate:** The Loan and each advance shall bear interest at a rate of fourteen percent (14%) per annum assessed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day, but excluding the last).<br><br>**DIP Loan Agreement, Paragraph 13: Default Interest:** N/A |
| Term 4001(c)(1)(B) | **DIP Loan Agreement, Paragraph 4: Repayment:** The Borrower hereby unconditionally promises to pay Lender in cash the aggregate outstanding principal amount of the Loan and all accrued, but unpaid interest and fees thereon on the Termination Date.  No payments of principal or interest shall be required to be made prior to the Termination Date.  "Termination Date" shall mean the earliest to occur of: (a) 270 days after the date on which Borrower files its Chapter 11 petition; (b) the effective date of a plan of reorganization of Borrower, (c) the date that is thirty-five (35) days after the date of entry of the Interim DIP Order, in form and substance reasonably acceptable to Lender, but only if the Bankruptcy Court shall not have entered a the Final Dip Order on or before such date, and (d) the acceleration of the Loan upon the occurrence of an Event of Default (as such term is defined below). |
| Events of Default 4001(c)(1)(B) | **DIP Loan Agreement, Paragraph 12: Events of Default:**<br>An event of default shall occur if any of the following events shall occur (each an "Event of Default"):<br>a.       The entry of an order dismissing Borrower's Chapter 11 case or converting Borrower's Chapter 11 case to a chapter 7 case that, in each case, is not stayed within ten (10) days following entry.<br>b.       The entry of an order appointing a Chapter 11 trustee that is not stayed within ten (10) days following entry.<br>c.       The entry of an order by the Bankruptcy Court granting any other superpriority claim or lien on the Collateral equal or superior to that granted to Lender.<br>d.       The entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner adverse to Lender and without the prior written consent of Lender, the Loan, the Interim DIP Order or the Final DIP Order approving the Loan.<br>e.       The entry of an order in Borrower's Chapter 11 case |

7

<table>
<tr><td></td><td>

appointing an examiner having enlarged powers to operate or manage the financial affairs of the Borrower.

f.      Following entry of the Final DIP Order, the entry of an order in Borrower's case under sections 506(c) or 552(b) of the Bankruptcy Code or under any bankruptcy against Lender regarding the Loan that has a material adverse effect on Lender's rights and remedies under the Loan or any Bankruptcy Court order.

g.      The filing of any pleading by Borrower seeking, or otherwise consenting to or supporting, any of the matters set forth in clauses a. through f. above.

h.      Failure to pay any principal or interest due hereunder within ten (10) days after the same becomes due.

i.      Any representation or warranty made by Borrower in this Agreement or in connection with any borrowing or request for an advance hereunder or in any certificate, financial statement, or other statement furnished by Borrower to Lender is untrue in any material respect at the time when made.

j.      Default by Borrower in the observance or performance of any of the covenants or agreements contained herein.

k.      Any of the documents executed and delivered in connection herewith shall for any reason cease to be valid or in full force and effect.

l.      Default in any term, condition or covenant in any other document or instrument made and given in connection herewith.

m.      Lender otherwise in good faith deems itself to be insecure, the value of the Collateral to have declined, or the prospect of timely payment or performance to be impaired.

</td></tr>
<tr><td>

Priority or Liens 4001(c)(1)(B)(i)

</td><td>

**DIP Loan Agreement, Paragraph 7(a): Borrower Collateral: See ¶13 above**

**DIP Loan Agreement, Paragraph 7(f): Superpriority:** the Loan will constitute allowed superpriority administrative expense claims in Borrower's Bankruptcy case having priority under Section 364(c)(i) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to: (i) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. §1930(a); (ii) the aggregate of the

</td></tr>
</table>

8

|  | allowed reasonable fees and expenses incurred by the Borrower in connection with the administration of its Chapter 11 case, including, without limitation, the fees, costs and expenses of the Borrower's professionals and advisors not to exceed the amount set forth in the applicable Cash Budget.   After the entry of the DIP Order and pursuant to and to the extent provided therein, the Loan will be secured by a valid, legal and perfected lien on and security interest in all of the Collateral of the Borrower having the priority afforded by Sections 364(c)(1), (2) and (3) and 364(d)(1) of the Bankruptcy Code, as set forth in the DIP Order.  The Borrower hereby consents to the lien priming provisions herein and in the DIP Order regarding the priming of any liens held by the Borrower.  "Dip Order" means the Interim DIP Order prior to the entry of the Final DIP Order and the Final DIP Order after entry of the Final DIP Order. |
|---|---|
| Adequate Protection or Priority of Prepetition Claims 4001(c)(1)(B)(ii) | **DIP Loan Agreement, Paragraph 7(g): Adequate Protection:** Adequate protection will be afforded to the Lender in the form of: (i) replacement liens on any and all non-avoidable, valid, enforceable and perfected collateral held by such lenders; (ii) a non-avoidable, valid, enforceable and perfected lien, subject only to those liens securing the Loan on all of Borrower's assets which are collateral under the Loan but not included in (i) above, and (iii) a priority adequate protection claim ranking junior to the claims of the Lender. |
| Validity of Liens 4001(c)(1)(B)(iii) | **DIP Loan Agreement, Paragraph 7(e): Title; Filing.**  Borrower warrants that, except as previously disclosed to Lender or as set forth herein, it is the owner of all the Collateral free and clear of all liens, claims, and encumbrances of whatever kind or nature and that no financing statement is now on file in any public office covering any of the Collateral or any of the proceeds thereof and that so long as any portion of the Loan remains unpaid, Borrower will not execute or file a financing statement or security agreement covering the Collateral to anyone other than Lender, except as set forth herein. Borrower agrees to sign and deliver one or more financing statements or supplements thereto or other instruments as Lender may, from time to time, require to comply with the UCC or other applicable law to preserve, protect and enforce the security interest of Lender and to pay all costs of filing such statements or instruments. |
| Waivers of Automatic Stay 4001(c)(1)(B)(iv) | **N/A** |
| Waivers or Modifications Regarding Plan Filing 4001(c)(1)(B)(v) | **N/A** |
| Deadlines | **DIP Loan Agreement, Paragraph 4:** Repayment is required on the |

9

| | |
|---|---|
| 4001(c)(1)(B)(vi) | Termination Date.  "Termination Date" means the earliest to occur of: (a) 270 days after the date on which Borrower files its Chapter 11 petition; (b) the effective date of a plan of reorganization of Borrower, (c) the date that is thirty-five (35) days after the date of entry of the Interim DIP Order, in form and substance reasonably acceptable to Lender, but only if the Bankruptcy Court shall not have entered a the Final Dip Order on or before such date, and (d) the acceleration of the Loan upon the occurrence of an Event of Default. |
| Waivers of Nonbankruptcy Law 4001(c)(1)(B)(vii) | **DIP Loan Agreement, Paragraph 13:** Borrower waives any rights to presentment, demand, protest, or notice of any kind in connection with this Agreement or any other loan document. |
| Releases and Waivers of Causes of Action 4001 (c)(1)(B)(viii) | N/A |
| Indemnification 4001(c)(1)(B)(ix) | **DIP Loan Agreement, Paragraph 10(e)**: (1)       Borrower shall protect, indemnify and save harmless Lender from and against all liabilities, losses, obligations, claims, damages, penalties, causes of actions, costs and expenses, including reasonable attorney's fees (whether or not the attorney is a salaried employee of Lender), imposed upon, incurred by or asserted against Lender and arising from any state of facts or circumstances existing prior to Lender's acquiring title to any of the Collateral through foreclosure or deed-in-lieu of foreclosure, or due to any action or inaction of Borrower, by reason of (1) ownership of the Collateral or any interest therein, (2) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Materials on, from or affecting the Collateral or any other property, (3) any person injury, including wrongful death or property damage, arising out of or related to such Hazardous Materials, (4) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Materials, or (5) any violation of laws, orders, regulations, requirements, or demands which are based upon or in any way related to such Hazardous Materials. |
| Releases, Waivers, or Limitations of Any Right Under § 506(c) 4001(c)(1)(B)(x) | N/A |
| Granting of Certain Liens 4001(c)(1)(B)(xi) | N/A |
| Cross- Collateralization Local Rule 4001-2(a)(1)(A) | N/A |

4834-2854-6080.3

| Provisions Binding the Estate | *See* "Validity of Liens" above pursuant to Rule 4001(c)(1)(B)(iii) |
|---|---|
| Local Rule 4001- 2(a)(1)(B) | N/A |
| Waiver of 552(b) Rights Local Rule 4001- 2(a)(1)(C) | *See* "Releases, Waivers, or Limitations of Any Right Under § 506(c)" above pursuant to Rule 4001(c)(1)(B)(x). |
| Granting Liens of Section 5 Claims Local Rule 4001- 2(a)(1)(D) | N/A |
| Prepetition and Postpetition Secured Debt Local Rule 4001- 2(a)(1)(E) | N/A |
| Disparate Treatment of Debtor and Committee Professionals Local Rule 4001- 2(a)(1)(F) | N/A |
| Priming Liens Without Consent Local Rule 4001- 2(a)(1)(G) | **DIP Loan Agreement, Paragraph 7(f): Superpriority:** *See* Priority or Liens 4001(c)(1)(B)(i) above. |
| Summary of Loan Local Rule 4001- 2(a)(2) | A summary of the essential terms of the DIP Loan are set forth above. |

## BASIS FOR RELIEF

### A. LEGAL STANDARD

### 15. <u>Bankruptcy Code Section 363(b)(1).</u>

Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." In considering a proposed use of property outside of the ordinary course, courts look at whether the proposed use of the property is in the best interests of the estate based on the facts of the case. *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (9th Cir. BAP 1988) (citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)). This requires an examination of the "business justification" for the proposed use. *Walter*, 83 B.R. at 19 ("[F]or the debtor-in-

possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business . . . .").

In determining whether the use of estate property outside of the ordinary course of business should be approved, "the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *Id.*; *see also Continental Air Lines*, 780 F.2d at 1226.

16.     **Bankruptcy Code Sections 364(c) and (d).**

Section 364(c) of the Bankruptcy Code provides: "If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  Section 364(d)(1) further provides: "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

When a debtor's business judgment is consistent with the provisions of and polices underlying the Bankruptcy Code, courts routinely grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., In re Ames Dept. Stores, Inc.*, 115 B.R. 34,

40 (Bankr. S.D.N.Y. 1990) (courts have discretion under Bankruptcy Code § 364 to permit debtor to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest); *see also In re Defender Drug Stores*, 145 B.R. 312, 316-317 (9th Cir. BAP 1992) ("Bankruptcy courts, however, have regularly authorized post-petition financing arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364. While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender. Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." (citations omitted)); *see also In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008).

17.     **Bankruptcy Code Section 105(a)**.

Section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.

**B.  AUTHORIZING THE DEBTOR TO OBTAIN THE PROPOSED POST-PETITION FINANCING AND GRANTING RELATED RELIEF IS PROPER.**

As discussed above, the proposed DIP Loan will allow the Debtor to obtain the cash it needs to achieve an orderly reorganization of the Debtor's business while preserving the value of the Debtor's estate for the benefit of creditors.

Based upon all of the above, the Debtor believes that entering into the DIP Loan based on the terms of the DIP Loan Agreement reflects a sound and prudent exercise of its business judgment under the circumstances, and is in the best interests of the estate and its creditors. The Debtor therefore seeks a Court order approving these actions.

### NOTICE

Notice of the First-day Motions and this Motion has been given to (a) the Office of the United States Trustee for the District of Utah, (b) counsel for the Debtor's prepetition secured lender (Castlelake), Mark Hindley, Esq., Stoel Rives, and (c) the twenty largest unsecured creditors.  Pursuant to Bankruptcy Rule 9006(c)(1), the Court may shorten time with our without notice.  In light of the nature of the relief requested in this Motion, the Debtor respectfully submits that no further notice is necessary.

### CONCLUSION

The relief requested in this Motion should be granted because it is necessary to ensure the orderly liquidation of the Debtor, and because the Debtor believes that granting such relief ultimately will benefit its creditors in this case.

WHEREFORE, the Debtor respectfully requests that the Court enter an order:

4834-2854-6080.3

1.      Authorizing the Debtor to enter into the DIP Loan with the DIP Lender in accordance with the terms in the DIP Loan Agreement and the proposed Interim and Final Orders, and to take all actions necessary to consummate the DIP Loan;

2.      Authorizing and approving the Debtor to grant priming liens on all of its current and future property as collateral and super priority claims in connection with the proposed DIP Loan;

3.      Approving modification of the automatic stay to the extent necessary to implement and enforce the terms and provisions of the proposed DIP Loan; and

5.      Granting related relief, including setting a Final Hearing on this Motion.

DATED October 31, 2014.

/s/J. Thomas Beckett
J. Thomas Beckett
Brian M. Rothschild
PARSONS BEHLE & LATIMER

15

4834-2854-6080.3

## Exhibit A

**Marion Energy Inc DIP Loan and Security Agreement**

## DIP LOAN AND SECURITY AGREEMENT

THIS DIP LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into this ___ day of November, 2014, by and between KM Custodians Pty Ltd., an Australian company, ("Lender"), and Marion Energy Inc., a Texas corporation ("Borrower").

### RECITALS

A.       Borrower filed for relief under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") Case No. 13-31632 in the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court").

B.       Borrower desires to borrow and Lender desires to lend the aggregate sum of $4,200,000 (the "Total Commitment"), which amount, subject to the terms and conditions of this Agreement and the Interim and Final DIP Orders (as such terms are defined below), shall be advanced in increments of $500,000, other than the Initial Advance Amount (defined below) (the "Loan").

C.       Prior to entering into this Agreement, Borrower shall obtain an order of the Bankruptcy Court, pursuant to Bankruptcy Code §364(c)(2), Fed.R.Bankr.P. 4001(c) and Local Rule 4001-2, authorizing and approving, on an interim (the "Interim DIP Order") and final (the "Final DIP Order") basis the post-petition secured financing contemplated in this Agreement.

D.       Lender is willing to make the loan to Borrower upon the terms and conditions hereinafter set forth.

NOW THEREFORE, to that end and in consideration of the premises, covenants and agreements contained herein, and the mutual benefits to be derived from this Agreement, the parties agree as follows:

### TERMS

1.       <u>Incorporation of Recitals</u>. All of the terms and representations set forth in the above Recitals are hereby incorporated by this reference.

2.       <u>Commitment</u>. Lender hereby agrees to make a loan to Borrower in the maximum principal amount of the Total Commitment. Subject to the terms and conditions contained herein, the Total Commitment shall be made available by Lender to Borrower, except for the Initial Advance Amount, in increments of $500,000 ("Advance Amount").  The sum of $700,000 (the "Initial Advance Amount") shall be advanced upon entry of the Interim DIP Order and each subsequent advance of an Advance Amount shall be made at the request of the Borrower on or after the entry of a Final DIP Order.

3.       <u>Advances</u>. The proceeds of advances hereunder may be used only for the following purposes: (i) working capital, (ii) general expenditures, including, without limitation, capital expenditures, and (iii) general corporate needs of the Borrower that are consistent with the "Cash Budget," including, without limitation, the payment of fees and expenses, including attorney fees, incurred in furtherance of Borrower's Chapter 11 case.  Lender may refuse to

make a requested advance if Borrower is in default in any term hereof or if an event or condition exists which, with the giving of notice or passing of time, would constitute an Event of Default hereunder.  The term "Cash Budget" means: a monthly statement of sources and uses for the period through June 2015, broken down by month, including the anticipated uses of any advance requested to be made for such period, all in form and substance reasonably satisfactory to Lender.

4.    Repayment. The Borrower hereby unconditionally promises to pay Lender in cash the aggregate outstanding principal amount of the Loan and all accrued, but unpaid interest and fees thereon on the Termination Date.  No payments of principal or interest shall be required to be made prior to the Termination Date.  "Termination Date" shall mean the earliest to occur of: (a) 270 days after the date on which Borrower files its Chapter 11 petition; (b) the effective date of a plan of reorganization of Borrower, (c) the date that is thirty-five (35) days after the date of entry of the Interim DIP Order, in form and substance reasonably acceptable to Lender, but only if the Bankruptcy Court shall not have entered a the Final Dip Order on or before such date, and (d) the acceleration of the Loan upon the occurrence of an Event of Default (as such term is defined below).

5.    Prepayment.   The Borrower shall have the right at any time and from time to time to prepay the Loan, in whole or in part, without premium or penalty.

6.    Interest.      The Loan and each advance shall bear interest at a rate of fourteen percent (14%) per annum assessed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day, but excluding the last).

7.    Collateral and Priorities.

a.    Borrower Collateral. As collateral for the performance of Borrower's obligations and liabilities in connection with the Loan, Borrower shall and does hereby grant Lender, or shall cause to be granted to Lender, a security interest in all of Borrower's right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrower (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Borrower, and regardless of where located (all of which will be collectively referred to as the "Collateral"), including:

(i)      All Collateral described in that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of even date herewith, by and among Borrower as trustor, Matthew D. Cook, as trustee and Lender, as beneficiary.

(ii)     all Accounts;

(iii)    all Chattel Paper;

(iv)    all Copyrights, Patents and Trademarks;

(v)     all Documents;

(vi)    all Equipment;

2

4833-0952-9120.6

(vii)     all Fixtures;

(viii)    all General Intangibles;

(ix)      all Goods;

(x)       all Instruments;

(xi)      all Inventory;

(xii)     all Investment Property;

(xiii)    all cash or cash equivalents;

(xiv)     all letters of credit, Letter-of-Credit Rights and Supporting Obligations;

(xv)      all Deposit Accounts with any bank or other financial institution; and

(xvi)     all accessions to, substitutions for and replacements, proceeds (including Stock Rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing.

      b.    <u>Collateral Definitions</u>.  For purposes of this Agreement, the following terms have the following meaning:

"<u>Accounts</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Chattel Paper</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Control</u>" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"<u>Copyrights</u>" means, with respect to any person, all of such person's right, title, and interest in and to the following:  (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing throughout the world.

"<u>Deposit Account Control Agreement</u>" means an agreement, in form and substance satisfactory to the Lender, among Borrower, a banking institution holding Borrower's funds, and the Lender with respect to collection and control of all deposits and balances held in a deposit account maintained by Borrower with such banking institution.

"<u>Deposit Accounts</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Documents</u>" shall have the meaning set forth in Article 9 of the UCC.

3

"Equipment" shall have the meaning set forth in Article 9 of the UCC.

"Fixtures" shall have the meaning set forth in Article 9 of the UCC.

"General Intangibles" shall have the meaning set forth in Article 9 of the UCC.

"Goods" shall have the meaning set forth in Article 9 of the UCC.

"Instruments" shall have the meaning set forth in Article 9 of the UCC.

"Inventory" shall have the meaning set forth in Article 9 of the UCC.

"Investment Property" shall have the meaning set forth in Article 9 of the UCC.

"Letter-of-Credit Rights" shall have the meaning set forth in Article 9 of the UCC.

"Licenses" means, with respect to any person, all of such person's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements in and to its Patents, Copyrights, or Trademarks, (b) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future breaches thereof, and (c) all rights to sue for past, present, and future breaches thereof.

"Patents" means, with respect to any person, all of such person's right, title, and interest in and to:  (a) any and all patents and patent applications; (b) all inventions and improvements described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, and continuations-in-part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing throughout the world.

"Pledged Collateral" means all Instruments, Securities and other Investment Property of the Borrower, whether or not physically delivered to the Lender pursuant to this Security Agreement.

"Receivables" means the Accounts, Chattel Paper, Documents, Investment Property, Instruments and any other rights or claims to receive money which are General Intangibles or which are otherwise included as Collateral.

"Security" shall have the meaning set forth in Article 8 of the UCC.

"Stock Rights" means all dividends, instruments or other distributions and any other right or property which the Borrower shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any equity interest constituting

4

Collateral, any right to receive an equity interest and any right to receive earnings, in which the Borrower now has or hereafter acquires any right, issued by an issuer of such equity interest.

"Supporting Obligations" shall have the meaning set forth in Article 9 of the UCC.

"Trademarks" means, with respect to any person, all of such person's right, title, and interest in and to the following:  (a) all trademarks (including service marks), trade names, trade dress, and trade styles and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (f) all rights corresponding to any of the foregoing throughout the world.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of Utah or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, Lender's lien on any Collateral.


    c. Perfection and Protection of Security Interest.  Borrower shall, at Borrower's expense, perform all steps reasonably requested by Lender at any time to perfect, maintain, protect, and enforce Lender's liens.  To the extent permitted by any legal requirement, Lender may file, without Borrower's signature, one or more financing statements or similar statements disclosing Lender's lien on the Collateral.

    d. Inspection of Collateral. Borrower hereby grants to Lender a security interest in all ledger sheets, books, records, and documents concerning any of the Collateral, including all computer records, programs, storage media and computer software useful or required in connection therewith. Borrower will at all times keep accurate and complete records of the Collateral. Lender or any of its agents will have the right at any time to enter any premises where any of the Collateral or records pertaining thereto are located to inspect the same and to inspect, audit, check, and make extracts from any records or other data relating to the Collateral or any part thereof.

    e. Title; Filing. Borrower warrants that, except as previously disclosed to Lender or as set forth herein, it is the owner of the Collateral free and clear of all liens, claims, and encumbrances of whatever kind or nature and that no financing statement is now on file in any public office covering any of the Collateral or any of the proceeds thereof and that so long as any portion of the Loan remains unpaid, Borrower will not execute or file a financing statement or security agreement covering the Collateral to anyone other than Lender, except as set forth herein. Borrower agrees to sign and deliver one or more financing statements or supplements thereto or other instruments as Lender may, from time to time, require to comply with the UCC or other applicable law to preserve, protect and enforce the security interest of Lender and to pay all costs of filing such statements or instruments.

5

f.   Super-Priority.   After entry of the DIP Order, and to the extent provided therein, the Loan will constitute allowed super-priority administrative expense claims in Borrower's Bankruptcy case having priority under Section 364(c)(i) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to: (i) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. §1930(a); (ii) the aggregate of the allowed reasonable fees and expenses incurred by the Borrower in connection with the administration of its Chapter 11 case, including, without limitation, the fees, costs and expenses of the Borrower's professionals and advisors not to exceed the amount set forth in the applicable Cash Budget.   After the entry of the DIP Order and pursuant to and to the extent provided therein, the Loan will be secured by a valid, legal and perfected lien on and security interest in all of the Collateral of the Borrower having the priority afforded by Sections 364(c)(1), (2) and (3) and 364(d)(1) of the Bankruptcy Code, as set forth in the DIP Order.   The Borrower hereby consents to the lien priming provisions herein and in the DIP Order regarding the priming of any liens held by the Borrower.   "DIP Order" means the Interim DIP Order prior to the entry of the Final DIP Order and the Final DIP Order after entry of the Final DIP Order.

g.   Adequate Protection.   The Interim DIP Order and Final DIP Order will include the provision of adequate protection for Borrower's pre-petition lenders, which shall be in the form of: (i) replacement liens on any and all non-avoidable, valid, enforceable and perfected collateral held by such lenders; (ii) a non-avoidable, valid, enforceable and perfected lien, subject only to those liens securing the Loan on all of Borrower's assets which are collateral under the Loan but not included in (i) above, and (iii) a priority adequate protection claim ranking junior to the claims of the Lender.

8.   Conditions Precedent.  Lender shall not be required to make any advance hereunder unless and until each of the following conditions precedent have been satisfied:

a.   All of the documents required by Lender, including this Agreement all guaranties, resolutions, financing statements or other documents have been duly executed and delivered to Lender and shall be in full force and effect.

b.   The representations and warranties contained in this Agreement are then true with the same effect as though the representations and warranties had been made at such time. The request for an advance by Borrower shall constitute a representation and warranty by it to Lender that all of the conditions specified herein exist as of that time.

c.   Lender shall have received a Cash Budget.

d.   Lender shall have received the Interim DIP Order, which order shall have been entered by the Bankruptcy Court, after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c), authorizing and approving the transactions contemplated by the this Agreement and finding that Lender is extending credit to the Borrower in good faith within

6

the meaning of Bankruptcy Code Section 364(e), which Interim DIP Order shall: (i) approve the payment by Borrower of all Lender's fees incurred in connection with the Loan, (ii) otherwise be satisfactory to Lender and (iii) be in full force and effect and shall not have been stayed, reversed, vacated, or otherwise modified in a manner adverse to Lender.

e.     As to any subsequent Advance Amount, Lender shall have received a copy of the Final DIP Order, which Final DIP Order: (i) shall be in form and substance satisfactory to Lender and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect; and, if the Final DIP Order is the subject of a pending appeal in any respect, neither the making of the Loan, nor the ability of the Borrower to perform any of their respective obligations hereunder, under any other loan documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

f.     The making of any advance shall comply with the applicable Cash Budget.

9.     <u>Representations and Warranties</u>. In order to induce Lender to enter into this Agreement and to make the advances provided for herein, Borrower represents and warrants to Lender as follows:

a.     Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas with the power to own its assets and to transact business in Utah.

b.     Borrower is the owner, in fee simple, of the Collateral.

c.     Borrower has the authority and power to execute and deliver any document required hereunder and to perform any condition or obligation imposed under the terms of such documents.

d.     The execution, delivery and performance of this Agreement, and each document incident hereto, by Borrower will not violate any provision of any applicable order, judgment, decree, articles of incorporation, bylaws, indenture, contract, agreement, or other undertaking or, to the best of Borrower's knowledge, law, rule or regulation to which Borrower is a party, or which purports to be binding on Borrower or its or their assets and will not result in the creation or imposition of a lien on any of its or their assets.

e.     Other than as disclosed to Lender, there is no action, suit, investigation, or proceeding pending or, to the knowledge of Borrower, threatened, against or affecting Borrower or any of its or their assets which, if adversely determined, would have a material adverse effect on or change the financial condition of Borrower or the operation of Borrower's business, or would materially impair Borrower's ability to perform hereunder.

f.     Borrower has (1) filed all applicable federal, state, and local tax returns or other statements required to be filed in connection with its business, including those for income taxes, sales taxes, property taxes, payroll taxes, payroll withholding amounts, FICA contributions, and similar items; (2) maintained appropriate reserves for the accrual of the same; and (3) paid when due all such taxes, or sums or assessments made in connection therewith.

7

Provided, however, that (until distraint, foreclosure, sale, or similar proceedings have been commenced) nothing herein shall require Borrower to pay any sum or assessment the validity of which is being contested in good faith by proceedings diligently pursued and as to which adequate reserves have been made.

g.      Borrower's Accounts represent valid transactions negotiated in good faith, are legally enforceable according to the terms thereof without offset in any manner for any claim, and are not subject to any defenses.

10.     <u>Affirmative Covenants</u>. So long as any amounts due hereunder remain unpaid, Borrower covenants and agrees that it shall do the following:

a.      <u>Financial Statements, Reports, etc.</u>  Furnish to Lender the following:

(1)      Within three (3) business days after the end of each monthly period of the Borrower, a Cash Budget.

(2)      Within five (5) business days after the end of each fiscal month of Borrower, cash flows for the preceding fiscal month showing the financial results of their operations during such fiscal month and setting forth (i) in comparative form the corresponding figures for the corresponding figures contained in the projections in the Cash Budget and (ii) the sum of each line item since the petition date, all of which shall be in reasonable detail and which statements of cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial results of operations of the Borrower on a cash basis.

(3)      Within forty-five (45) days after the end of each fiscal quarter of each fiscal year of the Borrower consolidated and consolidating balance sheets and related statements of operations and cash flows showing the financial position of the Borrower as of the close of such fiscal quarter and the consolidated results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower on a consolidated basis in accordance with GAAP (subject to normal year -end audit adjustments and the absence of footnotes).

(4)      Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any loan document, or such consolidated financial statements, as in each case Lender may reasonably request; Borrower shall duly observe and conform to all valid requirements of any governmental authority relative to the conduct of its business, employees, properties, or assets and shall maintain and keep in full force and effect all licenses and permits necessary to the proper conduct of its business.

8

b.      Maintenance of Books and Records.  Borrower shall keep proper books of records and accounts in which full, true, and correct entries will be made of all dealings or transactions relating to its business and activities.

c.      Site Visits.  Borrower shall permit any person designated in writing by Lender to visit its business premises, inspect any of its books and financial records, and to discuss its affairs and finances with its principal officers or employees, all at such reasonable times and as often as Lender may reasonably request, subject to any reasonable conditions imposed by Borrower.

d.      Tax Returns.  Borrower shall (1) file all applicable federal, state, and local tax returns or other statements required to be filed in connection with its business, including those for income taxes, sales taxes, property taxes, payroll taxes, payroll withholding amounts, FICA contributions, and similar items; (2) maintain appropriate reserves for the accrual of the same; and (3) pay when due all such taxes, or sums or assessments made in connection therewith; provided, however, that (until distraint, foreclosure, sale, or similar proceedings have been commenced) nothing herein shall require Borrower to pay any sum or assessment the validity of which is being contested in good faith by proceedings diligently pursued and as to which adequate reserves have been made.

e.      Compliance with Hazardous Materials Laws.   Comply,  and make reasonable efforts to cause all lessees and other persons occupying its properties to comply, with all Hazardous Materials Laws applicable to its operations and properties; and obtain and renew all material authorizations and permits required pursuant to Hazardous Materials Laws for its operations and properties, in each case in accordance with Hazardous Materials Laws, except to the extent the failure to do so could not reasonably be expected to have, individually or in the aggregate, a material adverse effect.

(1)     Borrower shall protect, indemnify and save harmless Lender from and against all liabilities, losses, obligations, claims, damages, penalties, causes of actions, costs and expenses, including reasonable attorney's fees (whether or not the attorney is a salaried employee of Lender), imposed upon, incurred by or asserted against Lender and arising from any state of facts or circumstances existing prior to Lender's acquiring title to any of the Collateral through foreclosure or deed-in-lieu of foreclosure, or due to any action or inaction of Borrower, by reason of (1) ownership of the Collateral or any interest therein, (2) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Materials on, from or affecting the Collateral or any other property, (3) any person injury, including wrongful death or property damage, arising out of or related to such Hazardous Materials, (4) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Materials, or (5) any violation of laws, orders, regulations, requirements, or demands which are based upon or in any way related to such Hazardous Materials.

(2)     For purposes of this Agreement, the term "Hazardous Materials" shall include, without limitation, gasoline, petroleum products, explosive, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, polychlorinated biphenyls or related or similar materials, asbestos or any material containing asbestos, or any other

9

substance or material as may be defined as a hazardous or toxic substance by any federal, state or local environmental law, ordinance, rule, or regulation (collectively the "Hazardous Materials Laws") including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Superfund Amendment and Reauthorization Act, the Hazardous Materials Transportation Act, as amended, the Resource Conservation and Recovery Act, as amended, the Federal Water Pollution Control Act, the Clean Air Act, and any other regulations adopted and publications promulgated pursuant thereto.

f.      <u>Reorganization Matters</u>.  Deliver to Lender, for review and comment, all material pleadings, motions and other documents to be filed by or on behalf of Borrower in Borrower's Bankruptcy case: (i) prior to the filing thereof, in the case of such documents substantially and directly related to the Loan, and (ii) as soon as practicable (and, if possible, prior to the filing thereof), in the case of all other documents not relating to the Loan; provided that any pleadings, motions and other documents substantially and directly related to the Loan shall be deemed to be material.

g.      <u>Further Assurances</u>.   Execute any and all further documents, mortgages, financing or financing change statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages and other documents and recordings of liens in stock registries), that may be required under any applicable law, or that the Lender may reasonably request, to effect the transactions contemplated by this Agreement or any other loan document to grant, preserve, protect or perfect the liens created or intended to be created by this Agreement or any other loan document, all at the expense of the Borrower, and provide to Lender, from time to time upon reasonable request, evidence as to the perfection and priority of the liens created or intended to be created by this Agreement or any other loan document; provided, however, that to the extent any such expenses are not included in the Cash Budget, Lender shall agree to modify the Cash Budget to account for such expenses.

11.    <u>Negative Covenants</u>. So long as any amounts due hereunder remain unpaid, Borrower covenants that it shall not do any of the following except with the prior written consent of Lender:

a.      Borrower shall not enter into any transaction of merger or consolidation, assign, transfer, sell, lease or otherwise dispose of all or a substantial portion of its assets, or acquire substantially all of the assets or business or assume substantially all of the liabilities of a person or other entity.

b.      Borrower acknowledges that Lender is making the Loan to it, in part, because of the skills, abilities, expertise and capabilities of its officers and executive management. Borrower shall not make any change in its officers, executive management or business purposes, as the case may be.

c.      Borrower shall not make any loans or advances to any person (including officers or shareholders of Borrower) or other entity other than in the normal and ordinary course of business now conducted; make any investment in securities of any person or other entity; or guarantee or otherwise become liable upon the obligations of any person or other entity, except

10

by endorsement of negotiable instruments for deposit or collection in the normal and ordinary course of business.

d.      Borrower shall not create, incur, assume, or suffer to exist, or permit any subsidiary to create, assume or suffer to exist, any mortgage, deed of trust, pledge, lien, security interest, assignment, deposit arrangement, or other preferential arrangement, charge, or encumbrance (including, without limitation, any conditional sale or other title retention agreement or finance lease) of any nature, upon or with respect to any of its properties, now owned or hereafter acquired; or sign or file, or permit any subsidiary to sign or file, under the UCC, a financing statement which names Borrower or any subsidiary as a debtor, or sign, or permit any subsidiary to sign, any security agreement authorizing any secured party thereunder to file such financing statement. Notwithstanding the foregoing, Borrower may undertake financial obligations in the normal course of business without Lender's prior consent.

e.      Borrower shall not create or permit to exist any lien, claim, or encumbrance on the Collateral or any part thereof, except as granted to Lender or contemplated hereunder or consented to in writing by Lender. Borrower shall not do or shall refrain from doing any act which may in any manner adversely affect Lender's interest in the Collateral or diminish the value thereof.

f.      Borrower shall not declare or make any distribution to its shareholders, whether in cash, assets, or in obligations of the Borrower, or allocate or otherwise set apart any sum for the payment of any distribution or bonus to officers of Borrower, unless (i) Borrower has realized an after-tax profit during the preceding fiscal year, (ii) all of Borrower's creditors are paid current, and (iii) Borrower has obtained Lender's prior written approval.

g.      Borrower shall not pay any compensation (including, but not limited to, wages, salaries, cash bonuses, management fees, commissions, consultant fees, or similar benefits which affect Borrower's cash flow) to its executive management in excess of such compensation presently in effect unless Borrower has obtained Lender's prior written approval.

12.      Events of Default. An event of default shall occur if any of the following events shall occur (each an "Event of Default"):

a.      The entry of an order dismissing Borrower's Chapter 11 case or converting Borrower's Chapter 11 case to a chapter 7 case that, in each case, is not stayed within ten (10) days following entry.

b.      The entry of an order appointing a Chapter 11 trustee that is not stayed within ten (10) days following entry.

c.      The entry of an order by the Bankruptcy Court granting any other super-priority claim or lien on the Collateral equal or superior to that granted to Lender.

d.      The entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner adverse to Lender and without the prior written consent of Lender, the Loan, the Interim DIP Order or the Final DIP Order approving the Loan.

11

e.       The entry of an order in Borrower's Chapter 11 case appointing an examiner having enlarged powers to operate or manage the financial affairs of the Borrower.

f.       Following entry of the Final DIP Order, the entry of an order in Borrower's case under sections 506(c) or 552(b) of the Bankruptcy Code or under any bankruptcy against Lender regarding the Loan that has a material adverse effect on Lender's rights and remedies under the Loan or any Bankruptcy Court order.

g.       The filing of any pleading by Borrower seeking, or otherwise consenting to or supporting, any of the matters set forth in clauses a. through f. above.

h.       Failure to pay any principal or interest due hereunder within ten (10) days after the same becomes due.

i.       Any representation or warranty made by Borrower in this Agreement or in connection with any borrowing or request for an advance hereunder or in any certificate, financial statement, or other statement furnished by Borrower to Lender is untrue in any material respect at the time when made.

j.       Default by Borrower in the observance or performance of any of the covenants or agreements contained herein.

k.       Any of the documents executed and delivered in connection herewith shall for any reason cease to be valid or in full force and effect.

l.       Default in any term, condition or covenant in any other document or instrument made and given in connection herewith.

m.       Lender otherwise in good faith deems itself to be insecure, the value of the Collateral to have declined, or the prospect of timely payment or performance to be impaired.

13.     Remedies. Upon an Event of Default by Borrower as defined in Paragraph 12 above, Lender may declare the entire unpaid principal balance of the Loan, together with accrued interest thereon, to be immediately due and payable without presentment, demand, protest or other notice of any kind. Lender may terminate any obligation it may have hereunder to make additional advances if Borrower is in default hereunder or if an event or condition exists which, with the giving of notice or passing of time, would constitute a default hereunder. Lender may proceed against Borrower or any Collateral simultaneously or in any order it chooses. Lender may release, settle, discharge, substitute or abandon its claim with respect to any party obligated hereunder, directly or indirectly, or to any of the Collateral without releasing, discharging or otherwise modifying its rights or remedies with respect to any remaining parties or Collateral. In addition to the foregoing, Lender shall have the remedies of a secured party under the UCC or other applicable law. Lender will have the right to enter upon any premises where the Collateral or any records pertaining thereto may be and take possession of such Collateral and records, without any obligation to pay rent to Borrower. Lender may remove the Collateral from such premises for such time as Lender may require to collect or liquidate the Collateral, through self-help and without judicial process or first obtaining a final judgment or giving notice and opportunity for a hearing on the validity of Borrower's claim. Borrower will, if requested by

12

Lender, assemble the Collateral and the records pertaining thereto at a place designated by Lender. Without notice to Borrower, Lender may obtain the appointment of a receiver of the business, property and assets of Borrower. To the extent permitted by law, Borrower waives any rights to presentment, demand, protest, or notice of any kind in connection with this Agreement or any other loan document. Lender may settle, compromise, or discharge any claim, lien, encumbrance, or dispute with respect to any Collateral, all on such terms and conditions as it, in good faith, deems appropriate. Lender may, but is not obligated to, take such action as it, in good faith, deems appropriate to preserve, protect, restore, refurbish, or defend any of the Collateral or its interest therein and in the process expend such funds as it deems appropriate. All sums expended by Lender and all costs incurred hereunder shall bear interest at the rate set forth herein, shall be secured by the Collateral, and shall be payable upon demand. No failure or delay on the part of Lender in exercising any right, power, or privilege hereunder shall constitute a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies provided herein are cumulative and not exclusive of any other rights or remedies provided at law or in equity. Borrower agrees to pay all costs of collection incurred by reason of the default, including court costs and reasonable attorney fees, whether or not the attorney is a salaried employee of Lender, including such expenses incurred before legal action or bankruptcy proceedings, during the pendency thereof and continuing to all such expenses in connection with any appeal to higher courts arising out of matters associated herewith.

14.    <u>Supervisory Rights</u>. Any supervisory or approval rights granted to Lender under this Agreement, or under any other document executed in connection herewith, and any opinions and recommendations made by any attorney retained or employed by Lender are solely for Lender's own protection. Neither Borrower nor any of Borrower's other creditors may rely on Lender or its counsel to protect their interests. Lender will be under no obligation to ensure that Borrower obtains proper insurance; to ensure that loan proceeds are used for their intended purposes; to require Borrower to maintain property records; to supervise Borrower's planned activities; to obtain lien waivers or releases; to obtain governmental approvals or authorizations; or to exercise any of its other rights under this Agreement or any other document executed in connection herewith. This Agreement and all other documents executed in connection herewith are enforceable even if Lender is negligent in administering this Loan, perfecting its security interest in the Collateral, or foreclosing on its security interest in the Collateral.

15.    <u>Notice</u>. Except for any notice required under applicable law to be given in another manner, any notice required or permitted to be given hereunder shall be personally delivered or delivered by overnight courier in each case with receipt acknowledged, or deposited in an official depository of the United States Postal Service, postage prepaid, by registered or certified mail, return receipt required, to the other party at the address listed below. All notices shall be deemed to have been duly given on (a) the date of receipt thereof if delivered personally or by overnight courier or (b) five (5) business days after the date of mailing thereof, if transmitted by mail. Each party may change its address for receipt of notices by a notice given to the other parties in accordance with this provision.

4833-0952-9120.6

| If to Lender: | KM Custodians Pty Ltd.,<br>Level 24, 333 Collins Street<br>Melbourne VIC 3000<br>Australia<br>Attention: Mark Korda |
| --- | --- |
| If to Borrower: | Marion Energy Inc.<br>3580 ORR Road<br>Allen, Texas 75002<br>Attention: Karel Louman |
| With a copy to: | Parsons Behle & Latimer<br>201 S. Main Street, Suite 1800<br>Salt Lake City, Utah 84111<br>Attention: Brian M. Rothschild |

16.  <u>Right of Set-Off</u>. In the event of default, Lender shall have the right to set off against any funds, debts, accounts, or certificates of deposit it owes Borrower either alone or together with other parties, whether now existing or hereafter arising, and Borrower hereby grants Lender a security interest in the same. Such right of set off may be exercised without notice and without regard to the maturity of the indebtedness, the complete mutuality of parties, or the availability of any Collateral.

17.  <u>Further Extensions of Credit</u>. Lender and Borrower, subject to approval of the Bankruptcy Court, may agree to increase the Total Commitment, extend the maturity of this Loan or otherwise modify or extend the terms of the Loan and this Agreement upon their mutual agreement.

18.  <u>General Provisions</u>. All representations and warranties made in the Agreement and in any certificate delivered pursuant thereto, shall survive the execution and delivery of this Agreement and the making of any loans hereunder. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender, their respective successors and assigns, except that Borrower may not assign or transfer its rights or delegate its duties hereunder without the consent of Lender. This Agreement and all documents and instruments associated herewith shall be governed by and construed and interpreted in accordance with the laws of the State of Utah. Time is of the essence hereof. This Agreement shall be deemed to express, embody, and supersede any previous understanding, agreements, or commitments, whether written or oral, between the parties with respect to general subject matter thereof. This Agreement may not be amended or modified except in writing signed by the parties. Each of the undersigned further agrees that, except to the extent otherwise specified in this Agreement, the terms and conditions of this Agreement, together with any related loan documents, shall supersede any other agreement to which any of the undersigned (excluding Lender) is a party. In the event the provisions of this Agreement conflict with the provisions of any other loan document, the provisions of this Agreement shall control.

EXECUTED on the day and year first written above.

LENDER:                                  KM CUSTODIANS PTY LTD.,
                                         an Australian company


                                         By:_____
                                         Its:_____


BORROWER:                                MARION ENERGY INC.,
                                         a Texas corporation


                                         By:_____
                                             Karel Louman

                                         Its: Chief Financial Officer

15

## Exhibit B

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re: | Case No. 13-31632 |
| MARION ENERGY INC, | Chapter 11 |
| Debtor, | Judge Joel T. Marker |

**INTERIM ORDER (1) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN
POST-PETITION FINANCING; (2) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (3) GRANTING
ADEQUATE PROTECTION; AND (4) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion")[1] of Marion Energy Inc, as debtor and debtor in possession (the "Debtor"), for entry of an interim order (this "Order") for entry of an order pursuant to 11 U.S.C. §§ 105, 361, 363, 364 and 507 of the Bankruptcy Code (1) authorizing post-petition financing, (2) granting liens and providing superpriority administrative expense status, (3) granting adequate protection, and (4) modifying the automatic stay in connection with debtor in possession financing, all as more fully described in the Motion; and the Court having jurisdiction to consider this Motion and the relief requested therein in accordance with 28 U.S.C §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and a hearing having been held to consider the interim relief requested in the Motion (the "Hearing"); and upon the First-Day Declaration, the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is granted on an interim basis pending the final hearing as set forth below.

2.      The Debtor is authorized to enter into the DIP Loan with the DIP Lender in accordance with the terms in the DIP Loan Agreement and to take all actions necessary to consummate the DIP Loan;

3.      The Debtor is authorized and approved to grant priming liens on all of its current and future property as collateral and superpriority claims in connection with the proposed DIP Loan;

4.      The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

5.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or otherwise deemed waived.

6.       Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

7.       Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective on an interim basis and enforceable upon its entry.

8.       Any objections to the relief requested in the Motion on a permanent basis must be filed no later than _____ at ___:00 a.m./p.m. (Mountain Daylight Time) (the "Objection Deadline"). If an objection is timely filed and served so as to be received on or before the Objection Deadline, such objection shall be set for hearing on _____, 2014 at ___:00 a.m./p.m. (Mountain Daylight Time).  This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an objection.

9.       The Court shall conduct a final hearing on the Motion on [date] at [time] at the United States Bankruptcy Court, Frank E. Moss, U.S. Courthouse, 350 South Main Street, Courtroom [no.], Salt Lake City, Utah 84101.

10.      Entry of this Interim Order is without prejudice to the rights of any party in interest to interpose an objection to the Motion, and any such objection will be considered on a *de novo* basis at the final hearing.

11.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

12.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

--------------------------------------------------*end of document*--------------------------------------------------

## Exhibit C

## Proposed Final Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re: | Case No. 13-31632 |
| MARION ENERGY INC, | Chapter 11 |
| Debtor, | Judge Joel T. Marker |

**FINAL ORDER (1) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN POST-PETITION FINANCING; (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (3) GRANTING ADEQUATE PROTECTION; AND (4) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion")[4] of Marion Energy Inc, as debtor and debtor in possession (the "Debtor"), for entry of an interim order (this "Order") pursuant to Bankruptcy Code sections 105, 363, 1107, and 1108 of the Bankruptcy Code (1) authorizing post-petition financing, (2) granting liens and providing superpriority administrative expense status, (3) granting adequate protection, and (4) modifying the automatic stay; and the Court having entered the *Interim Order (1) Authorizing Debtor in Possession to Obtain Post-Petition Financing; (2) Granting Liens and Providing Superpriority Administrative Expense Status; (3) Granting Adequate Protection; and (4) Modifying the Automatic Stay* [Docket No. _____]  (the

---

[4] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

"Interim Order"); and the Court having jurisdiction to consider this Motion and the relief
requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the
Motion and the relief requested therein being a core proceeding pursuant to pursuant to 28
U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and
1409; and due and proper notice of the Motion being adequate and appropriate under the
particular circumstances; and a hearing having been held to consider the relief requested in the
Motion (the "Hearing"); and upon the First-Day Declaration, the record of the Hearing and all
proceedings heard before the Court; and the Court having found and determined that the relief
sought in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties
in interest and that the legal and factual bases set forth in the Motion establish just cause for the
relief granted herein; and any objections to the requested relief having been withdrawn or
overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is
hereby ORDERED:

1.      The Motion is granted on a final basis to the extent provided herein.

2.      The Debtor is authorized to enter into the DIP Loan with the DIP Lender in
substantially in accordance with the terms in the DIP Loan Agreement and to take all actions
necessary to consummate the DIP Loan; to grant priming liens on all of its current and future
property as collateral and superpriority claims in connection with the proposed DIP Loan; and, to
take all actions necessary to effectuate the relief granted pursuant to this Order in accordance
with the Motion.

3.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062,
9014 or otherwise, this Order shall be immediately effective and enforceable upon its entry.

C-2

4.      The Court retains jurisdiction with respect to all matters arising from or related to

the interpretation or implementation of this Order.

--------------------------------------------------*end of document*--------------------------------------------------

4834-2854-6080.3

**<u>EXHIBIT D</u>**

**Eight Month Estimated Expenses Budget**

# Marion Energy Inc
## Eight Month Estimated Expenses

| | Nov 2014 | Dec 2014 | Jan 2015 | Feb 2015 | Mch 2015 | Apr 2015 | May 2015 | Jne 2015 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Direct Operating Expenses** | | | | | | | | | |
| **OPX & Maintenance** | $100,000 | $300,000 | $100,000 | $100,000 | $100,000 | $75,000 | $75,000 | $75,000 | $925,000 |
| **Compression** | $18,700 | $18,700 | $18,700 | $18,700 | $18,700 | $18,700 | $18,700 | $18,700 | $149,600 |
| **Total OPX** | $118,700 | $318,700 | $118,700 | $118,700 | $118,700 | $93,700 | $93,700 | $93,700 | $1,074,600 |
| | | | | | | | | | |
| **Indirect Opex:** | | | | | | | | | |
| **Salaries** | $35,200 | $35,200 | $35,200 | $35,200 | $35,200 | $35,200 | $35,200 | $35,200 | $281,600 |
| **Insurance** | $0 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $35,000 |
| **Auto/Travel** | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $80,000 |
| **Other** | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $160,000 |
| **Total Indirect Opex** | $65,200 | $70,200 | $70,200 | $70,200 | $70,200 | $70,200 | $70,200 | $70,200 | $556,600 |
| | | | | | | | | | |
| **Gen & Admin Costs:** | | | | | | | | | |
| **Salaries** | $134,200 | $134,200 | $134,200 | $134,200 | $134,200 | $134,200 | $134,200 | $134,200 | $1,073,600 |
| **Health Insurance** | $3,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $122,000 |
| **Accounting** | $10,000 | $0 | $0 | $10,000 | $30,000 | $0 | $10,000 | $0 | $60,000 |
| **Office Expenses** | $1,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $71,000 |
| **Legal** | $250,000 | $100,000 | $25,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $450,000 |
| **Consulting** | $25,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $60,000 |
| **Sale Process** | $0 | $0 | $0 | $0 | $50,000 | $50,000 | $50,000 | $50,000 | $200,000 |
| **Insurance** | $0 | $0 | $85,000 | $0 | $0 | $0 | $15,000 | $0 | $100,000 |
| **RoW** | $50,000 | $33,000 | $19,418 | $10,000 | $3,000 | $0 | $0 | $3,000 | $118,418 |
| **Tax** | $20,572 | $14,289 | $0 | $0 | $0 | $0 | $0 | $0 | $34,861 |
| **Bonds** | $3,750 | $0 | $0 | $0 | $13,395 | $10,026 | $0 | $0 | $27,171 |
| **Royalties** | $0 | $0 | $9,000 | $0 | $0 | $0 | $0 | $0 | $9,000 |
| **Questar** | $0 | $110,000 | $0 | $0 | $0 | $0 | $0 | $0 | $110,000 |
| **Travel** | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $80,000 |
| **Other** | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $40,000 |
| **Total Gen & Admin** | $512,522 | $438,489 | $319,618 | $216,200 | $292,595 | $256,226 | $271,200 | $249,200 | $2,556,050 |
| | | | | | | | | | |
| **Total Expenses** | $696,422 | $827,389 | $508,518 | $405,100 | $481,495 | $420,126 | $435,100 | $413,100 | $4,037,650 |